**Laurie Sue ROSE, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:12–cv–106 RP–TJS.**

United States District Court,
S.D. Iowa,
Central Division.

Aug. 28, 2012.

Timothy N. Tripp, Tripp, P.C., Pella, IA, for Laurie Sue Rose, Plaintiff.

William C. Purdy, U.S. Attorney's Office, Des Moines, IA, for Commissioner of Social Security, Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Defendant's Motion To Remand. Clerk's 12. Plaintiff resisted the motion arguing that a reversal with an award of benefits is the appropriate remedy. Clerk's 13. Defendant filed a reply to Plaintiff's resistance again arguing that the case should be remanded to the Commissioner for further administrative review and a new decision.

Plaintiff, Laurie Sue Rose, filed a Complaint in this Court on March 8, 2012, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq. and 1381 et seq. This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). The Commissioner argues that the Title II application should be evaluated on remand. Plaintiff was last insured for Title II benefits at the end of December 2005. Tr. at 432.

Plaintiff, whose date of birth is October 4, 1967, was nearly 43 years old (Tr. at 34) at the time of the hearing on October 19, 2010, before Administrative Law Judge Thomas M. Donahue (ALJ). Tr. at 29–59. The ALJ issued a Notice Of Decision— Unfavorable on October 28, 2010. Tr. at 9–23. The Appeals Council declined to review the ALJ's decision on January 18, 2012. Tr. at 1–3. Thereafter, Plaintiff commenced this action. Plaintiff's brief was filed June 28, 2012. Clerk's 11. Defendant's motion to remand was filed August 2, 2012. Plaintiff resisted the motion to remand on August 7, 2012, and Defendant replied on August 14, 2012.

At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after October 22, 2008, the date of the Title XVI application. Tr. at 14. At the second step, the ALJ found Plaintiff has the following severe impairments: asthmatic bronchitis; obesity; depressive disorder, not otherwise specified; panic disorder with agoraphobia; borderline personality disorder; and remote history of substance abuse in remission. The ALJ found that none of these impairments are of a severity to meet or equal the requirements of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the listings). Tr. at 15. At the fourth step, that ALJ found

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) involving lifting 50 pounds occasionally and 25 pounds frequently; sitting and standing 2 hours at a time for 6 hours in an 8 hour work day; walking two blocks; no climbing of ladders, ropes, or scaffolds; no working at heights; only occasional climbing of ramps and stairs; and only occasional balancing, stooping, kneeling, crouching, crawling, and bending. The individual would need a low stress level job such as a level 3 with 10 being the most stressful and 1 being the least stressful. The person would require a job involving no contact with the general public and limited contact with fellow workers.

Tr. at 16. The ALJ found that Plaintiff is unable to perform her past relevant. At the fifth step, the ALJ found that Plaintiff is able to do a significant number of jobs. Tr. at 21. Examples of such jobs hand packager, laundry worker II, and linen attendant. Tr. at 22. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 23.

## MEDICAL EVIDENCE

On April 29, 2002, Plaintiff was seen for a psychiatric evaluation by Ronald R. Berges, D.O. at Ottumwa Psychiatric Clinic. Plaintiff had been referred by another doctor. She was described as a 34 year old single, white female with significant anxiety which began two years before while she was pregnant with her second child. At that time, Plaintiff began having bad headaches, anxiety and panic-like spells. Until she saw Dr. Berges, she had seen a number of other psychiatrists for medication. Tr. at 479. On mental status exam, Plaintiff was extremely anxious and tremulous and was visibly shaking. Her mood and affect were anxious. Although Plaintiff said she had an abundance of energy, Dr. Berges found no evidence of mania. Symptoms of panic included nausea, trembling, numbness in her hands, fear of going crazy, increase heart rate, chest pain, shortness of breath, sweating and chills. The doctor wrote that Plaintiff had significant agoraphobia "to the point that she stops going out and even has people go to the store for her." The doctor also wrote: "I could elicit no significant signs of obsessive compulsive disorder, although she does tend to be a bit obsessive in her personality style." On Axis I, the diagnosis was panic disorder with agoraphobia. On Axis II, the diagnosis was obsessive compulsive personality traits. Tr. at 480. The doctor prescribed Klonopin and Trazodone. Plaintiff declined to consider outpatient therapy. Tr. at 481. Dr. Berges' office notes appear throughout the record. *See* Tr. at 434–78; Tr. at 283–86; Tr. at 371–74.

On July 26, 2011, Dr. Berges completed a mental residual functional capacity form. Tr. at 493–95. The doctor wrote that he treated Plaintiff for anxiety and panic attacks. He identified the following signs and symptoms associated with his diagnoses: sleep disturbance; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; generalized persistent anxiety; and symptoms of panic and depression. The doctor wrote that Plaintiff's symptoms also "may increase awareness of pain if present." He indicated that he would anticipate that Plaintiff would be absent from work more than three times a month. Tr. at 493. The doctor used a check box form to indicate various areas of work abilities. He use a scale of excellent, good, fair, and poor. Those marked poor were: 1) work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in a routine work setting; and, deal with normal work stress. The domains marked fair (the individual can perform the activity satisfactorily some of the time) were: 1) maintain attention for two hour segment; 2) maintain regular attendance and be punctual within customary, usually strict tolerances; 3) sustain an ordinary routine without special supervision; 4) make simple work-related decisions; 5) perform at a consistent pace without an unreasonable number and length of rest periods; 6) accept instructions and respond appropriately to criticism from supervisors; 7) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and, 8) be aware of normal hazards and take appropriate precautions. Tr. at 494. The doctor also opined that Plaintiff had marked limitation in her activities of daily living; ability to maintain social functioning; and maintain concentration, persistence or pace. He also stated that Plaintiff had four or more episodes

of decompensation, each of extended duration. Tr. at 495.

Plaintiff was treated for upper respiratory complaints by Lawrence E. Merrick, D.O., in Ottumwa, Iowa several times between March 9, 2007, and January 21, 2008. Tr. at 237–54.

On November 23, 2007, Plaintiff saw Robert J. Blommer, M.D. Plaintiff told the doctor she had been unable to go to work that day due to cough and respiratory congestion. The doctor noted that Plaintiff continued to smoke cigarettes despite being advised to stop. Plaintiff saw Dr. Blommer and other health care providers at the same clinic several times between November 23, 2007 and October 16, 2008. Tr. at 258–82.

Plaintiff saw Veronica Wells Butler, M.D. on July 24 and October 31, 2008. Tr. at 288–90.

Plaintiff was seen at the Emergency Department of Ottumwa Regional hospital on October 13, 2007, because of cough and chest discomfort. The diagnoses included acute bronchitis and asthma. Tr. at 293–307.

Plaintiff injured her right ankle and foot and was treated at the Ottumwa Regional Health Center on January 8, 2009. Tr. at 310. Plaintiff sustained a fracture. She was advised to apply ice, use crutches, wear a fiberglass splint, and to elevate her foot above chest level. Tr. at 315.

On February 18, 2009, Plaintiff saw Timothy E. Wahl, Ph.D. for a mental status exam. Plaintiff reported that her last job was at a Pizza Hut, but she was fired for being sick frequently. The doctor wrote:

> She stated that she has been fired on several occasions for being sick and "bad mood swings." She reported a history of "a lot" of problems getting along with both coworkers and supervisors, stating that she feels people are "out to get me," and they attempt to sabotage her.

She stated that people are always talking about her, and there is a lot of "catiness." She stated that she has walked out of a lot of positions due to conflict, adding "a lot of people don't like that I say what I mean." She stated that conflict has become physical, and she was fired once for slapping a coworker.

Physically, Plaintiff said she has asthma, chronic bronchitis and sinus infections, all of which cause her to be constantly tired. She said her chest hurts and she has shortness of breath. She also reported frequent headaches which she thinks are related to her sinuses. She was scheduled to have the cast on her ankle removed. Tr. at 327. On mental status exam, it was noted that Plaintiff was very talkative, but that she seldom answered a question directly, usually having to tell a story in a complaining, self-pitying manner. She was very histrionic and manipulative in her comments. Plaintiff described panic attacks which occur a couple times a week. She takes Xanax three times a day, "and per a doctor's report, there is a history of medication abuse." Tr. at 329. Dr. Wahl wrote:

> Affect appeared somewhat dramatic and labile, and while she seemed sad at points, she was jovial at others. She was open regarding revealing personal information, but insight was limited. She made good eye contact, and she was very verbal. She appeared rather nervous initially, and she excessively fidgeted with her key chain. As this writer suspected that this antic was staged, I purposely did not draw attention to it, and sure enough she eventually drew attention to her behavior, asking "will it bother you that I'm, fidgety." She came across as friendly enough, but she was very coy, whiny, negative, dramatic, and manipulative. At points it was almost as if she was using baby talk. She appears

prone to anger outbursts, however, this was not witnessed directly. Self-esteem and confidence is felt to be poor. She did appear to put forth good efforts on mental status tasks.

It was Dr. Wahl's opinion that Plaintiff appeared to be suited to a wide range of unskilled employment positions. He wrote:

Laurie Marlay[1] is a 41 year old female, referred for a current mental status exam. Overall cognitive functioning appears grossly intact based on this brief evaluation, and Laurie appears suited to a wide range of unskilled employment positions. She has previously been diagnosed with Panic Disorder with Agoraphobia, and she continues to have 1–2 panic attacks a week. She has a history of Xanax abuse, but reportedly is currently taking it as prescribed. She is reporting symptoms of depression, however, considering her limited insight and dramatic presentation of details, it was difficult to definitively diagnose. A recent progress note by her psychiatrist does not allude to a Mood Disorder diagnosis per se, just symptoms, and she is reportedly taking Cymbalta for depression. From a diagnostic stand point, she additionally meets criteria for Border line personality Disorder. Laurie currently is not taking her pulmonary medications as prescribed, and this appears to be an ongoing issue per records reviewed. She was manipulative in that she asked this writer to not tell her treating physician that she is non compliant with her medications.

Tr. at 330. Dr. Wahl stated that while Plaintiff's borderline personality traits will interfere with interpersonal relations with co-workers and supervisors, she maintained a waitressing job for ten years, and

is capable of minimally acceptable interpersonal skills when she chooses to use them. Tr. at 331.

Plaintiff's cast was removed on February 23, 2009, and she was permitted to begin weight bearing as tolerated. Tr. at 332.

On July 29, 2009, Bruce Lindberg, D.C. opined that Plaintiff should avoid heavy lifting and carrying as well as prolonged standing, walking, stooping, climbing, kneeling and crawling. Dr. Lindberg wrote that the had treated Plaintiff for several years for chronic neck and back pain. Tr. at 415.

Plaintiff submitted a Report on Incapacity completed by Ali Araghi dated June 6, 2011. It is not clear from the page and a half form if the person completing it is a physician or some other medical professional. Tr. at 430–31.

Plaintiff submitted the report of a physical functional capacity assessment done under the supervision of Mark Blankespoor, PT, DPT. Tr. at 484–90. At the conclusion of his report, the therapist made two "recommendations" which he said were for an eight hour day, forty hour week:

1) The client's capabilities are in the sedentary category (lifting up to 5 pounds on an occasional basis) of physical demand characteristics. Specific capabilities are noted with the FCE Test Results and Interpretation.

2) While the client's capabilities are in the sedentary category, she would have significant difficulty with performing work tasks on a full-time basis. [S]he would not be able to safely perform lifting, carrying, pushing, pulling, sitting, standing, walking, dexterity or positional

---

1. At the hearing, Plaintiff explained that she changed her name to Rose when she was divorced. Tr. at 35.

tasks on a continuous, day after day basis.

Tr. at 485.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at the hearing on October 19, 2010. The Court has read the testimony of Plaintiff, her witnesses and the vocational expert. After the ALJ asked the vocational expert the first hypothetical which reflected his finding of residual functional capacity (Tr. at 55–56), the vocational expert identified the jobs cited in the ALJ's decision. Tr. at 56–57. Thereafter, the ALJ asked a second hypothetical:

> Second hypothetical. Would be age 43, female. She has a twelfth grade, regular classes. Past relevant work as set forth in 19E. Lifting 10 pounds occasionally, five pounds frequently. Sitting, one hour at a time for six of an eight-hour day. Walking, two blocks. No climbing ladders, ropes, and scaffolds. No working at heights. Only occasional climbing of ramps and stairs. Only occasional balancing, stooping, kneeling, crouching, crawling, and bending. Would need a low-stress level job such as Level 3, which 10 being the most stressful and 1 being the least stressful. Would require a job with no contact with the general public and limited contact with fellow workers.... Due to chronic pain syndrome, depression, mental impairment, or any other reason, the claimant would miss three or more days work per month. Could the claimant do her past relevant work under this hypothetical?

Tr. at 57–58. In response, the vocational expert testified that missing three days of work per month would preclude any competitive employment. Tr. at 58.

## ARGUMENTS OF THE PARTIES

In the Motion to Remand, the Commissioner argues that while Plaintiff applied for both Title II and Title XVI benefits, the Title II application was not associated with the request for reconsideration or with the request for hearing by an ALJ. For that reason the ALJ did not consider Plaintiff's impairments prior to the date of the Title XVI application in 2008. The Commissioner argues that the ALJ should have considered the case from the alleged onset of disability date in July 2004[2] through the present The Commissioner also writes: "The ALJ will be notified regarding the status of subsequently pending claims, and the claimant will be provided with an opportunity for a new hearing and the opportunity to submit new evidence." Clerk's 12–1 at page 2.

Plaintiff responds that although Plaintiff was not represented by counsel at the hearing, the ALJ had the Abbreviated DIB Review Sheet which shows the date last insured of 12/05, and a date of filing as March 31, 2004. The same document shows another date of filing as October 15, 2008, within a few days of the filing of the current Title XVI application. Tr. at 135. Plaintiff also points out that she informed the Appeals Council of this error when Request for Review of the ALJ's decision was filed. Tr. at 231. Finally, Plaintiff urges the Court that if remand is ordered, to direct the ALJ to give controlling weight to the opinion of the treating psychiatrist, Dr. Berges. Clerk's 13. Plaintiff also contends that the evidence in the record, including that which was submitted to the Appeals Council supports a finding of disability without the need for a remand. *Id.*

The Commissioner counters that the final decision of the Commissioner is that of

---

**2.** It appears that Plaintiff filed a Title II application in 2004 as well as 2008. Tr. at 131.

the ALJ, and that he did not consider a period of four years. The Commissioner argues that Court is statutorily confined to review of the final decision of the Commissioner. Clerk's 14.

The Commissioner also argues that the ALJ should not be directed to give controlling weight to Dr. Berges' report. *Id.*

## DISCUSSION

■■■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola* [*v. Astrue*], 480 F.3d [885] at 886 [ (8th Cir.2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

■■ In *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote: "Probably the most important issue will be the question of RFC ..." The Court went on: "The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." While an ALJ is charged with determining a residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001).

In *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir.1995), the Court wrote:

When the Appeals Council has considered material new evidence and nonetheless declined review, the ALJ's decision becomes the final action of the Secretary. We then have no jurisdiction to review the Appeals Council's action because it is a nonfinal agency action. *See Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992). At this point, our task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ. As we have noted, "this [is] a peculiar task for a reviewing court." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994).

The Court has very carefully reviewed the evidence in this case as well as the arguments of the parties. Both parties agree that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and should be reversed. The bone of contention

is whether the Court should reverse with an order to award benefits or not.

██ In the opinion of the Court, the answer to this dilemma is found in the Memorandum in Support of Defendant's Motion to Remand wherein counsel wrote that "... the ALJ will be directed to re-evaluate the claimant's allegations from both her Title II and Title XVI applications from July 2004 through the present. This will mean that Plaintiff's Title II application will be reopened for good cause, the clerical error...." Only the Commissioner can reopen prior applications. *See Califano v. Sanders*, 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977), in which the Court of Appeals for the Seventh Circuit held that § 10 of the Administrative Procedure Act contains an independent grant of subject-matter jurisdiction, without regard to the amount in controversy, which afforded the district court jurisdiction to reopen an old application for Social Security Disability benefits. The Supreme Court disagreed and reversed the Court of Appeals. Thereafter, it has been well settled law that only the Commissioner may decide when and if to reopen prior applications. *See, e.g. Bullyan v. Heckler*, 787 F.2d 417, 419 (8th Cir.1986); *Driggins v. Bowen*, 791 F.2d 121, 123 (8th Cir.1986); *Rohrich v. Bowen*, 796 F.2d 1030, 1031 (8th Cir.1986). In each of these cases, the Court of Appeals for the Eighth Circuit relied on *Califano v. Sanders* for the proposition that a court only has jurisdiction the review a final decision made after a hearing, and that administrative finality prohibits a court from reviewing a decision which was not brought before the court within 60 days of the final decision of the agency.

██ If the Court were to decide to award benefits based on the 2008 application, it would deprive Plaintiff the opportunity to claim the benefits from the 2004 application which the Counsel concedes may well be reopened because of a clerical error. The Commissioner's Motion (Clerk's 12), therefore, is granted.

## CONCLUSION AND DECISION

The final decision of the Commissioner is reversed and remanded for further proceedings consistent with this Order and with Defendant's brief in support of the Motion. As requested, this order will be a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure and is a remand to Defendant Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b) [3]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

**3.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."